383

POOR QUALITY ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL D. JARRUS and
LINDA JARROUS,
    Plaintiffs,

v.

Case No. 4:25-cv-11168
Hon. F. Kay Behm
Mag. Judge Anthony P. Patti

GOVERNOR GRETCHEN WHITMER, et al.,
    Defendants.
_____/



FILED

AUG 20 2025

CLERK'S OFFICE
DETROIT

## PLAINTIFFS' SECOND AMENDED COMPLAINT,
## MEMORANDUM OF LAW,
## AND ACCOMPANYING EXHIBIT PACKET

/s/ Michael D. Jarrus

Michael D. Jarrus, Plaintiff (Pro Se)

526 South Alexander Ave.

Royal Oak, MI 48067

Phone: (248) 259-1645

Email: MikeJarrus@gmail.com *(contact for both Plaintiffs)*


/s/ Linda Jarrous

Linda Jarrous, Plaintiff (Pro Se)

526 South Alexander Ave.

Royal Oak, MI 48067

Phone: (248) 390-5172

1) **Second Amended Civil Rights Complaint**

1        **1) Second Amended Civil Rights Complaint**

2        2) UNITED STATES DISTRICT COURT

3        EASTERN DISTRICT OF MICHIGAN

4        SOUTHERN DIVISION

5        3) MICHAEL D. JARRUS and LINDA JARROUS, Case No. _____4:25-

6        cv-11168____

7        Plaintiffs, Hon. _____F. Kay Behm

8        4) ___Magistrate Hon. Anthony P. Patti_

9        5) /s/ Michael D. Jarrus

10        Michael D. Jarrus, Plaintiff (Pro Se)

11        526 South Alexander Ave.

12        Royal Oak, MI 48067

13        Phone: (248) 259-1645

14        Email: MikeJarrus@gmail.com

15        6) /s/ Linda Jarrous

16        Linda Jarrous, Plaintiff (Pro Se)

17        526 South Alexander Ave.

18        Royal Oak, MI 48067

19        Phone: (248) 390-5172

20        7) v.

21   8) GRETCHEN WHITMER, in her official capacity as Governor of Michigan;
22       DANA NESSEL, in her official capacity as Attorney General of Michigan;
23       ROYAL OAK POLICE DEPARTMENT;
24       DEPUTY CHIEF PATRICK STANTON, in his individual and official capacities;
25       DEPUTY CHIEF KEITH SPENCER, in his individual and official capacities;
26       KAREN BONADEO, Clerk's Office Supervisor, in her individual and official
27       capacities;
28       KEILA FITZPATRICK, FOIA Coordinator, in her individual and official
29       capacities;
30       MELISSA HELDRETH, FBI Agent, in her individual capacity;
31       JASON SLATER, Firearms Services Section Manager, Michigan State Police, in
32       his official capacity;
33       JOSHUA MARCUM, in his individual and official capacities as Attorney for the
34       City of Royal Oak;
35       KAREY KIRKPATRICK, FBI CJIS/NICS Agent, in her individual and official
36       capacities;
37       MICHIGAN STATE POLICE;
38       "NIC" NICCOLAS GROCHOWSKI and his team, identities to be determined;


39   9) Andrea Setler, in her official and individual capacities, Federal Bureau of
40       Investigation (FBI), Criminal Justice Information Services (CJIS) Division, NICS
41       Operations
42       JOHN DOES 1–10,
43           Defendants.


2

44          **10)        Second Amended Civil Rights Complaint**

45                            11)   Preliminary Statement

46

47                            12)   Plaintiffs Michael D. Jarrus and Linda

48      Jarrous bring this civil rights action to challenge a concerted

49      campaign by state, local, and federal officials to defy a valid

50      state court order, destroy and conceal evidence, suppress

51      access to public records, and retaliate against Plaintiffs for

52      asserting their rights—all in violation of fundamental

53      constitutional guarantees. This unlawful scheme has deprived

54      Plaintiffs of core liberties and subverted the rule of law.

55                            13)   Despite a lawful restoration of firearm

56      rights granted to Mr. Jarrus by a Michigan state court (attached

57      as Exhibit A-1), Defendants conspired to disregard that order

58      and prevent him from lawfully acquiring or possessing

59      firearms. Federal agents, including FBI Agent Melissa

60      Heldreth and an official known as "NICCOLAS

61      GROCHOWSKI " directly coordinated with Royal Oak police

62    and Michigan authorities to nullify the state court's decision—

63    effectively overruling a judge's ruling through extrajudicial

64    means. This blatant federal-state collusion flouts Mr. Jarrus's

65    Second and Fourteenth Amendment rights and even intrudes

66    upon state judicial authority in violation of Tenth Amendment

67    principles of federalism.


68              14)    When Plaintiffs attempted to vindicate their

69    rights through lawful channels—filing Freedom of Information

70    Act (FOIA) requests, internal complaints, and appeals—

71    Defendants retaliated with a campaign of obstruction and

72    intimidation. Rather than address Plaintiffs' legitimate

73    grievances, officials engaged in efforts to silence and punish

74    them: issuing false and contradictory FOIA responses to deny

75    access to public records, willfully destroying key evidence

76    (including lobby surveillance video and an audio (Exhibit

77    AR-1&2) recording of a critical phone call), and subjecting

78    Plaintiffs to heightened police surveillance around their home.

79    These actions were intended to cover up misconduct and deter

80    further inquiry. Such conduct violates due process, undermines

4

81      government transparency, and impedes Plaintiffs' access to the

82      courts.


83              15)    Plaintiff Linda Jarrous—who has no

84      disqualifying history or adjudication—has been swept up in

85      this unlawful scheme solely due to her association with her

86      son. She was even wrongfully denied a firearm purchase on

87      the pretext of her household's status, demonstrating that

88      Defendants targeted her purely out of retaliation and "guilt by

89      association." Both Plaintiffs have been subjected to fear and

90      unwarranted harassment for doing nothing more than insisting

91      that officials obey a court order and respect their rights.


92              16)    As a direct result of Defendants'

93      coordinated misconduct, Mr. Jarrus remains unable to exercise

94      his constitutionally protected right to keep and bear arms,

95      despite being fully eligible under the law, and Ms. Jarrous's

96      ability to obtain a firearm has likewise been unjustifiably

97      impeded. Plaintiffs have suffered severe emotional distress,

98      reputational harm, and even physical effects (Mr. Jarrus has

99    experienced stress-induced flare-ups of multiple sclerosis) due

100   to the prolonged denial of their rights. They now turn to this

101   Honorable Court for relief. Plaintiffs seek declaratory and

102   injunctive remedies to restore their rights and halt the ongoing

103   abuses, as well as compensatory and punitive damages—

104   potentially exceeding $32 million—to punish this egregious

105   abuse of power and deter such misconduct in the future.

106          17)    Plaintiffs bring this civil rights action under

107   42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*,

108   403 U.S. 388 (1971), to redress a coordinated pattern of

109   unlawful and retaliatory conduct by local, state, and federal

110   officials acting under color of law. Defendants have jointly

111   violated Plaintiffs' rights under the First, Second, Fourth, Fifth,

112   Tenth, and Fourteenth Amendments to the U.S. Constitution.

113   Plaintiffs seek declaratory and injunctive relief to halt the

114   ongoing deprivation of their rights, along with compensatory

115   and punitive damages to redress the harm and deter future

116   misconduct.

117        18)    Jurisdiction and Venue ( SEE  EXHIBIT G BINING

118              ADMISSION FROM ATTORNEY HENDERSON

119              VERIFYING THIS IS THE PROPER JURISDICTION)

120              19)    Jurisdiction: This Court has original

121    jurisdiction over this action under 28 U.S.C. § 1331, as the

122    claims arise under the Constitution and laws of the United

123    States (including 42 U.S.C. § 1983 and the First, Second,

124    Fourth, Fifth, Tenth, and Fourteenth Amendments). The Court

125    has supplemental jurisdiction over related state law claims

126    under 28 U.S.C. § 1367(a), as they form part of the same case

127    or controversy.

128              20)    Venue: Venue is proper in the Eastern

129    District of Michigan under 28 U.S.C. § 1391(b) because a

130    substantial part of the events or omissions giving rise to

131    Plaintiffs' claims occurred in this District. All of the key

132    actions and omissions by Royal Oak officials (including

133    Defendants Stanton, Spencer, Bonadeo, and Fitzpatrick) took

134    place in Oakland County, Michigan, which lies in this District.

135    Additionally, all Defendants reside in or operate within this

136    District, and the core incidents concerning firearm rights, First

7

137      Amendment retaliation, obstruction of public records, and

138      destruction of evidence occurred here.

139               21)    Intra-District Assignment: Assignment to

140      the Detroit Division is appropriate under Local Rule 83.10, as

141      the events giving rise to the claims occurred in Oakland

142      County (Royal Oak, Michigan), which is within the Detroit

143      Division of the Eastern District of Michigan.

144               22)   Parties

145               23)   Plaintiffs: Michael D. Jarrus and Linda

146      Jarrous are United States citizens residing at 526 South

147      Alexander Avenue, Royal Oak, Michigan 48067. They are

148      close family members (son and mother) who have jointly

149      suffered from Defendants' unlawful conduct. Both are law-

150      abiding individuals who have consistently asserted their rights

151      through lawful channels. At all relevant times, they have been

152      ready and eligible to exercise their Second Amendment rights

153      and to petition the government for redress of grievances

154      without fear of retaliation. *(Plaintiff Michael Jarrus can be*

155      *contacted at 248-259-1645, and Plaintiff Linda Jarrous at*

8

156    *248-390-5172.)*

157              24)    Defendant Gretchen Whitmer: Governor of

158    Michigan, sued in her official capacity for declaratory and

159    injunctive relief pursuant to *Ex parte Young*, 209 U.S. 123

160    (1908), which permits suits against state officials to enjoin

161    ongoing violations of federal law. As the State's chief

162    executive, Governor Whitmer bears ultimate responsibility for

163    ensuring that Michigan's laws, policies, and practices comply

164    with the United States Constitution. She exercises supervisory

165    authority over all executive branch agencies, including the

166    Michigan State Police and other departments involved in

167    firearms policy, records management, and enforcement of

168    court orders. Through either direct action or willful inaction,

169    Governor Whitmer has permitted—and failed to prevent—the

170    continued deprivation of Plaintiffs' federally protected rights,

171    including their rights under the Second, First, and Fourteenth

172    Amendments. Her principal office is located in Lansing,

173    Michigan.

174              25)    Defendant Andrea R. Setler is an employee

175    of the Federal Bureau of Investigation ("FBI"), Criminal

176   Justice Information Services Division (CJISD). In this

177   capacity, Setler was directly involved in communications with

178   the Royal Oak Police Department and the Michigan State

179   Police regarding Plaintiff's firearm background check records

180   and the continuing enforcement of 18 U.S.C. § 922(g)(4).

181   Acting under color of federal law, Setler advised and

182   coordinated with state and local officials to maintain a federal

183   firearms disability against Plaintiff despite state court orders

184   and statutory restoration of rights, thereby contributing to the

185   ongoing violation of Plaintiffs' Second and Fifth Amendment

186   rights.

187        26)   Defendant Karey Kirkpatrick: An agent of

188   the Federal Bureau of Investigation (FBI), sued in both her

189   individual and official capacities. Upon information and belief,

190   Kirkpatrick is assigned to the FBI's Criminal Justice

191   Information Services (CJIS) Division, NICS Section, and is

192   based in West Virginia. She serves as an external instructor and

193   consultant on firearm background check systems, including the

194   Michigan Law Enforcement Information Network (LEIN) and

195   related databases. Kirkpatrick directly communicated with

10

196        officials from the City of Royal Oak—including Records

197        Supervisor Karen Bonadeo—regarding Plaintiff Michael

198        Jarrus's firearm eligibility. She provided informal guidance

199        and directives outside any formal legal process, including

200        advising that Mr. Jarrus not be cleared in the background

201        check system, even after a valid Michigan state court had

202        restored his rights. Kirkpatrick's actions played a direct role in

203        undermining judicial authority and perpetuating the

204        deprivation of Plaintiffs' constitutional rights. She is sued for

205        her role in collaborating to violate Plaintiffs' rights under color

206        of both federal and state law.

207                27)    Defendant Dana Nessel: Attorney General

208        of Michigan, sued in her official capacity. As Michigan's chief

209        law enforcement officer and legal advisor to state agencies,

210        Attorney General Nessel is responsible for ensuring

211        Michigan's laws are enforced consistent with the U.S.

212        Constitution. Her duties include overseeing state compliance

213        with court orders, proper interpretation of firearm laws, and

214        adherence to public records laws. Upon information and belief,

215        Attorney General Nessel (or her deputies) became aware of the

216    court order restoring Mr. Jarrus's rights and the subsequent

217    actions of Royal Oak officials, but failed to intervene or

218    correct ongoing violations. She is sued under *Ex parte Young*

219    in her official capacity to obtain injunctive relief preventing

220    the continued enforcement or sanctioning of unconstitutional

221    practices.

222          28)    Defendant Joshua Marcum: An attorney for

223    the City of Royal Oak, Michigan, sued in both his individual

224    and official capacities. Marcum participated in the internal

225    handling of Plaintiff Michael Jarrus's FOIA requests and was

226    included in internal communications about releasing,

227    redacting, or withholding documents responsive to those

228    requests. Plaintiffs allege that Marcum helped shape or

229    approve the City's FOIA responses that unlawfully denied

230    access to public records and concealed evidence of

231    wrongdoing. His actions contributed to the FOIA violations

232    and denial of Plaintiffs' rights, making him liable under 42

233    U.S.C. § 1983 (and under state law provisions of FOIA as

234    applicable).

235          29)    Defendant Royal Oak Police Department

12

236   (ROPD): The municipal police department of the City of

237   Royal Oak, Michigan. ROPD is responsible for law

238   enforcement and public safety in Royal Oak. At all relevant

239   times, ROPD and its officers, supervisors, and policymakers

240   (including Defendants Stanton, Spencer, Bonadeo, and

241   Fitzpatrick) acted under color of state law. ROPD is a "person"

242   for purposes of § 1983 in that it is subject to suit for actions

243   taken pursuant to official policy or custom (*Monell v. Dep't of*

244   *Soc. Servs.*, 436 U.S. 658 (1978)). ROPD is sued for injunctive

245   relief and, to the extent allowed by law, for damages, based on

246   its deliberate indifference, failure to supervise, and

247   unconstitutional policies or practices regarding firearm rights,

248   evidence retention, and retaliation against citizens.

249   30)   Defendant Deputy Chief Patrick Stanton: A

250   Deputy Chief of Police with ROPD, sued in his individual

251   capacity (for damages) and official capacity (for declaratory

252   and injunctive relief). At all relevant times, Stanton acted

253   under color of state law and in a supervisory role within

254   ROPD. He personally participated in, or at minimum knew of

255   and condoned, the unconstitutional denial of Michael Jarrus's

13

256   firearm rights and the retaliation against Plaintiffs for asserting

257   their rights. Stanton made explicit retaliatory remarks to Mr.

258   Jarrus, such as: "You're not getting a gun on my watch," and

259   "You'll never get your rights back," even after being presented

260   with the valid court order. These statements (made in his

261   official capacity at the police station) display a personal

262   vendetta and an institutional refusal to follow the law. Stanton

263   also either directed or approved the deletion and suppression

264   of public records (including surveillance video) documenting

265   these events. His actions violated Plaintiffs' First, Second, and

266   Fourteenth Amendment rights, subjecting him to liability

267   under § 1983.

268         31)    Defendant Deputy Chief Keith Spencer: A

269   Deputy Chief of Police with ROPD, sued in his individual and

270   official capacities. At relevant times, Spencer acted under color

271   of state law and shared supervisory authority at ROPD. He

272   directly participated in the misconduct, including coordinating

273   the deletion of lobby camera footage (see Exhibit C) of a May

274   2024 confrontation with Mr. Jarrus, participating in email

275   chains with FBI Agent Heldreth and "Nic" concerning FOIA

14

276 and firearm issues, and continuing to enforce an unlawful ban

277 on Mr. Jarrus's firearms rights after the state court order.

278 Spencer's actions, both personally and as a policy-maker,

279 violated clearly established First, Second, and Fourteenth

280 Amendment rights, making him liable under § 1983. see

281 (exhibit c communications)

282   32) Defendant Karen Bonadeo: Clerk's Office

283 Supervisor for the City of Royal Oak (and by extension

284 ROPD's records unit), sued in her individual and official

285 capacities. Bonadeo oversaw clerical operations including

286 responses to FOIA requests and management of records. Under

287 color of state law, she participated in improperly denying

288 Plaintiffs' FOIA requests – issuing false "no records"

289 responses and coordinating with other Defendants to obstruct

290 access to records. She also personally harassed Mr. Jarrus; for

291 example, when he inquired about his rights and records,

292 Bonadeo told him words to the effect of: "You're not getting

293 your rights back, especially not in this city or state." These

294 retaliatory remarks, made in the course of her official duties,

295 show intent to punish Plaintiffs for asserting their rights.

296    Bonadeo additionally facilitated or allowed the deletion of

297    critical video/audio evidence (Exhibit AR-1) after learning it

298    was requested. Her conduct violated Plaintiffs' First, Second,

299    and Fourteenth Amendment rights (and Michigan FOIA law),

300    and she is liable under § 1983 and state law (MCL 15.231 et

301    seq.).

302        33)    Defendant Keila Fitzpatrick: FOIA

303    Coordinator for the City of Royal Oak (or ROPD), sued in her

304    individual and official capacities. Fitzpatrick was responsible

305    for processing public records requests under Michigan's FOIA.

306    Acting under color of state law, she knowingly issued false and

307    misleading responses to Plaintiffs' FOIA requests – initially

308    claiming no responsive records existed despite evidence to the

309    contrary, and later refusing to produce records by wrongfully

310    invoking exemptions. She failed to conduct a good-faith

311    search, withheld non-exempt material, and conspired with

312    others to conceal evidence of constitutional violations (e.g., by

313    delaying responses, altering retention schedules, and ignoring

314    appeal obligations). Fitzpatrick's actions deprived Plaintiffs of

315    their state-law right to public records and their federal right of

16

316   access to the courts. She is liable under § 1983 for the

317   constitutional harms and under Michigan law for the FOIA

318   violations.

319        34)   Defendant Melissa Heldreth: An agent of

320   the FBI, sued in her individual capacity. At all relevant times,

321   Heldreth acted under color of federal law *and* under color of

322   state law through joint action with state officials. Plaintiffs

323   allege that Heldreth worked in concert with Royal Oak

324   officials (including Stanton and Spencer) to interfere with the

325   enforcement of the state court order restoring Mr. Jarrus's

326   firearm rights. On information and belief, Heldreth advised or

327   directed ROPD not to honor the state order (see Exhibit C),

328   ensured that federal background check databases (NICS)

329   continued to flag Mr. Jarrus as prohibited despite the state

330   court's decision (contrary to 18 U.S.C. § 921(a)(20)), and

331   discussed withholding or destroying records to cover up this

332   misconduct. By collaborating to deprive Plaintiffs of their

333   rights, Heldreth is liable under *Bivens* and, via the joint action

334   doctrine, under § 1983.

335        35)   Defendant "Nic" (Last Name Unknown)

17

336    and His Team: An unidentified law enforcement agent

337    (believed to be federal or state) referred to in communications

338    as NICCOLAS GROCHOWSKI  along with a group of

339    officers or agents working with him. Based on internal emails

340    and FOIA disclosures, "NICCOLAS GROCHOWSKI and his

341    team" were involved in discussions with ROPD officials and

342    FBI Agent Heldreth about how to handle Mr. Jarrus's firearm

343    status and FOIA inquiries. These individuals, once identified,

344    will be joined as Defendants. Each is believed to have acted

345    under color of law (state and/or federal) by jointly

346    participating in decisions to deny Mr. Jarrus's rights and

347    conceal evidence. They are sued in their individual capacities

348    (and official capacities to the extent injunctive relief might

349    apply). Upon identification, they will be liable under § 1983

350    for their role in violating Plaintiffs' constitutional rights. (see

351    exhibt c )

352            36)    Defendant Michigan State Police (MSP):

353    The Michigan State Police is a state law enforcement agency.

354    It is named as a Defendant primarily for prospective relief (no

355    damages are sought from MSP as an arm of the state, due to

18

356          Eleventh Amendment immunity). MSP manages statewide law

357          enforcement databases such as the Law Enforcement

358          Information Network (LEIN). MSP was notified of the court

359          order restoring Mr. Jarrus's rights (as that order directed

360          removal of his name from LEIN), yet upon information and

361          belief MSP failed to promptly or properly update its records.

362          MSP's inaction allowed Mr. Jarrus to remain erroneously listed

363          as prohibited, contributing to the continued denial of his rights.

364          To the extent MSP or its officials maintained Mr. Jarrus's

365          disqualification in LEIN without legal basis, they facilitated

366          the ongoing constitutional violations. MSP is therefore named

367          for the purpose of ensuring full injunctive relief (updating of

368          records and enforcement of state law compliance).

369   37) John Doe Defendants 1–10 (and Jane Doe Defendants 1–10): Unknown individuals who, at
370          relevant times, were employed by or affiliated with the City of Royal Oak, ROPD, the State of
371          Michigan, or a federal agency, and who directly or indirectly participated in the misconduct
372          described herein. These Doe Defendants may include IT staff involved in deletion of
373          video/audio files (Exhibit AR1& 2, administrative staff who processed or obstructed FOIA
374          requests, officers who carried out or ordered the denial of permits, or other officials who
375          retaliated against Plaintiffs. Each such person acted under color of state or federal law and is
376          sued in their individual capacity (and official capacity if injunctive relief is needed). Plaintiffs
377          will seek to identify these individuals through discovery and amend the Complaint accordingly.
378          All Doe Defendants are liable under § 1983 for their direct participation in, or knowing
379          acquiescence to, violations of Plaintiffs' First, Second, Fourth, Fifth, and Fourteenth
380          Amendment rights.

381          38)    Factual Allegations

382          39)    Policy and Custom at Royal Oak (Monell

383   Allegations): The Royal Oak Police Department, through its

384   officials, developed and maintained customs or policies

385   responsible for the violations of Plaintiffs' rights. As detailed

386   below, ROPD leadership made a deliberate choice to disregard

387   court mandates and retaliate against those who challenged

388   them, reflecting an official policy or widespread practice

389   attributable to the City of Royal Oak.

390          40)    ROPD Refusal to Comply with Restoration

391   Order: Despite being notified of the court Order, Defendants—

392   particularly ROPD officials Stanton and Spencer—refused to

393   comply with or implement it. Rather than take steps to correct

394   Mr. Jarrus's status and restore his rights in accordance with the

395   court's directive, they willfully disregarded the judgment and

396   continued to treat him as a prohibited person. On information

397   and belief, ROPD either contacted or was contacted by FBI

398   Agent Heldreth and possibly MSP personnel shortly after the

399   Order was issued, and they collectively decided to maintain

20

400    Mr. Jarrus's prohibited status in government systems as if the

401    Order had never been entered. This was done deliberately, in

402    bad faith, without any lawful authority or judicial override, and

403    in direct defiance of the full faith and credit owed to a valid

404    state court judgment. Their refusal to act on a binding court

405    order constitutes an unlawful usurpation of judicial authority

406    and a violation of Plaintiffs' constitutional and statutory rights.

407          41)    Evidence of Improper Motives – Database

408    Queries (Exhibits E): Through FOIA disclosures, Plaintiffs

409    obtained records of database queries (CLEMS/LEIN)

410    associated with their names and address (Exhibits E-1 through

411    E-10). These records show that Defendants – including ROPD

412    and MSP officials – relied on a litany of non-criminal,

413    irrelevant incidents (family disputes, old welfare checks, minor

414    complaints that never led to charges, even incidents involving

415    deceased relatives) to justify treating Plaintiffs as persons of

416    interest or prohibited individuals. None of these incidents

417    resulted in any disqualifying adjudication or ongoing legal

418    disability. The continued reliance on such records, despite the

419    absence of any legitimate disqualifier, demonstrates a pattern

21

420  of arbitrary, retaliatory, and unconstitutional conduct that

421  violated Plaintiffs' due process rights. This misuse of law

422  enforcement databases to flag or stigmatize Plaintiffs without

423  cause exemplifies the customs or practices challenged in this

424  suit.

425  42)  Chronology of Defendants' Unlawful

426  Conduct:

427  43)  Restoration of Firearm Rights (April 10,

428  2024): On April 10, 2024, the Circuit Court for Oakland

429  County, Michigan entered a binding Order restoring Plaintiff

430  Michael J. Jarrus's rights to purchase, possess, and carry

431  firearms (in accordance with MCL 28.424 et seq.). This Order

432  (Exhibit A-1) was issued after a full judicial proceeding, which

433  included consideration of Mr. Jarrus's prior mental health

434  history and any other potential disqualifiers. The court found

435  Mr. Jarrus rehabilitated and fit to have his firearm rights

436  reinstated. The Order explicitly directed that Mr. Jarrus be

437  removed from any firearms prohibition databases (including

438        Michigan's LEIN). No party appealed or contested this Order,

439        and it became final and fully enforceable.

440            44)    Notification of Authorities:Immediately

441        after the state court issued the firearm rights restoration Order,

442        Plaintiffs took swift and proactive steps to ensure that all

443        relevant agencies were properly notified. Certified copies of

444        the Order were hand-delivered or transmitted to the Royal Oak

445        Police Department, the Michigan State Police (including its

446        Firearms Records and LEIN divisions), and, upon information

447        and belief, to federal NICS officials. Defendants Stanton and

448        Spencer of the Royal Oak Police Department personally

449        received or were made aware of the Order and its legal effect.

450        By mid-April 2024, all named Defendants had actual or

451        constructive notice that Plaintiff Michael Jarrus was no longer

452        subject to any firearm prohibition under state or federal law—

453        and that continued enforcement of any such restriction would

454        be unlawful.

455            45)    Continued Defiance of Court Order:Despite

456        the clear and binding nature of the state court Order restoring

457        Mr. Jarrus's firearm rights, Defendants continued to treat him

23

458     as a prohibited person. Rather than honor the Order by

459     updating records or adjusting their handling of his status,

460     Defendants willfully disregarded it. The Royal Oak Police

461     Department—acting in coordination with FBI Agent Melissa

462     Heldreth and, upon information and belief, the Michigan State

463     Police—maintained Mr. Jarrus's prohibited status as though

464     the Order had never been issued. This conduct was not the

465     result of error or oversight, but a deliberate act of defiance

466     taken in bad faith and without any lawful justification. In

467     doing so, Defendants directly contravened the authority of the

468     state judiciary and unlawfully deprived Mr. Jarrus of his

469     constitutional rights.

470                 46)    Attempts to Exercise Restored Rights: Soon

471     after the court issued the Order restoring his rights, Plaintiff

472     Michael Jarrus took steps to assert those rights. He inquired

473     about retrieving a previously confiscated firearm and

474     submitted an application to purchase a new firearm—seeking

475     the required purchase permit from the Royal Oak Police

476     Department, as he did not yet hold a concealed pistol license.

477     In response, either Deputy Chief Stanton directly, or officers

478    acting under his direction, informed Mr. Jarrus that he

479    remained "flagged" in the system and that ROPD would not

480    process his request. He was effectively told that, regardless of

481    the court's Order, the department still considered him

482    prohibited from possessing firearms. This response made clear

483    that Defendants had no intention of complying with the law

484    and were actively obstructing Mr. Jarrus's attempt to lawfully

485    exercise his restored Second Amendment rights.

486                        47)    Unlawful Obstruction of Permit Process:

487    When Mr. Jarrus formally applied for a handgun purchase

488    permit, ROPD personnel delayed and obstructed the process.

489    Officers (under Defendants Stanton and Spencer's direction)

490    discouraged him from even applying, warning that he was

491    "wasting everyone's time" and insinuating that further

492    attempts could lead to unspecified consequences. ROPD

493    ultimately refused to process the application, falsely claiming

494    that Mr. Jarrus was still "flagged" in the system or that there

495    were "pending issues," despite no pending legal action against

496    him. These assertions were made without any basis in law or

497    fact.

498     48) Retaliation Against Complaints – Police

499   Harassment: In response to ROPD's refusal to comply with the

500   court's restoration Order, Plaintiff Michael Jarrus filed an

501   internal complaint with the Royal Oak Police Department and

502   notified City officials that the police were defying a valid

503   judicial directive. Around the same time, Plaintiff Linda

504   Jarrous—his mother—attempted to purchase a firearm for her

505   own protection but was wrongfully denied. She was told that

506   her household's "status" was under review, despite having no

507   disqualifying history of her own. Shortly after these lawful

508   complaints and permit attempts, Plaintiffs observed a

509   noticeable and abrupt increase in marked police patrols

510   cruising through their neighborhood and loitering near their

511   residence. While no verbal threats were made, the timing and

512   persistence of these patrols—entirely out of step with prior law

513   enforcement patterns in the area—suggested an intentional

514   effort to intimidate and retaliate against Plaintiffs for asserting

515   their rights. Plaintiffs reasonably interpreted this conduct as

516   retaliatory surveillance meant to chill further complaints or

517   legal action.

518        49)    Federal Involvement as Pretext:Defendants

519    further attempted to justify their continued defiance of the

520    court Order by invoking alleged federal disapproval. On

521    multiple occasions in 2024, Defendants Stanton and Spencer—

522    as well as other ROPD personnel—told Mr. Jarrus and Plaintiff

523    Jarrous statements to the effect of: "The FBI hasn't cleared

524    you," and "We're waiting on Lansing and the feds." These

525    remarks make clear that ROPD's refusal to comply was not

526    based on Michigan law or any new disqualifying event, but

527    rather on deference to pressure or informal direction from

528    federal actors, such as FBI NICS officials, and possibly the

529    Michigan State Police. In doing so, local officials unlawfully

530    ceded their independent legal authority to outside entities that

531    had no power to override a binding state court order—

532    effectively allowing federal and state agencies to impose an

533    unconstitutional veto on a matter that had already been

534    resolved by the judiciary.

535        50)    Joint Federal-State Encroachment: This

536    collusion between federal and local officials undermined the

537    constitutional balance of power and violated fundamental

27

538        principles of federalism. The Tenth Amendment reserves to the

539        states the authority to adjudicate and determine matters such as

540        the restoration of civil rights, including firearm rights. By

541        allowing FBI agents and federal background check officials to

542        dictate whether a valid state court order would be recognized

543        or enforced, Defendants effectively permitted an

544        impermissible federal commandeering of state processes—

545        prohibited under *Printz v. United States*, 521 U.S. 898 (1997).

546        The continued maintenance of false prohibitory records in

547        federal databases—despite the clear and final judgment of a

548        state court—further violated Mr. Jarrus's right to due process

549        and contravened the principle articulated in *United States v.*

550        *Bean*, 537 U.S. 71 (2002), which recognizes the binding nature

551        of state rights restoration decisions in the absence of any

552        operative federal review mechanism.

553                    51)    Violation of Second Amendment Rights:

554        Defendants' conduct has unlawfully stripped Mr. Jarrus of his

555        fundamental right to keep and bear arms, as guaranteed by the

556        Second Amendment to the United States Constitution (as

557        incorporated against the states through the Fourteenth

28

558    Amendment) and by Article I, § 6 of the Michigan

559    Constitution. By continuing to treat Mr. Jarrus as a prohibited

560    person despite a valid court order and in the absence of any

561    lawful basis, Defendants imposed a de facto, extrajudicial ban

562    on his ability to lawfully acquire, possess, or use firearms.

563    Such an outright denial of a core constitutional right is

564    categorically impermissible under *District of Columbia v.*

565    *Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*,

566    561 U.S. 742 (2010), both of which affirm that the right to

567    keep and bear arms belongs to law-abiding citizens and may

568    not be revoked through informal or unlawful governmental

569    action.

570            52)    Ongoing Injury to Plaintiffs: As a direct and

571    ongoing result of Defendants' unlawful conduct, Mr. Jarrus has

572    been unable to lawfully purchase or possess firearms, despite

573    being fully eligible under both state and federal law. Plaintiff

574    Linda Jarrous has likewise been denied the ability to obtain a

575    firearm—not due to any disqualifying factor of her own, but

576    solely based on her association with Mr. Jarrus. Both Plaintiffs

577    have endured fear, anxiety, and the chilling effect of knowing

29

578    that their lawful rights are being disregarded by the very

579    officials sworn to uphold them. They have lived under a

580    persistent cloud of uncertainty and intimidation, fully aware

581    that local authorities not only refuse to recognize binding legal

582    orders but have actively enlisted federal agencies to help

583    perpetuate this unconstitutional deprivation.

584            53)    De Facto Firearm Ban: Defendants' refusal

585    to comply with the restoration Order amounts to a de facto ban

586    on Mr. Jarrus's exercise of his Second Amendment rights. Mr.

587    Jarrus has been prevented from recovering his previously

588    owned firearms, denied purchase permits, and even thwarted in

589    third-party transactions at gun stores — all without any lawful

590    basis. This complete prohibition on an individual who has no

591    disqualifications is precisely the kind of infringement the

592    Second Amendment (and Michigan's analog) forbids.

593            54)    Undermining State Sovereignty and Due

594    Process:No federal or state law grants Defendants the authority

595    to disregard a valid state court order restoring an individual's

596    civil rights. At no time has any court overturned, stayed, or

597    superseded that restoration Order. By continuing to enforce a

30

598     firearm prohibition that was lawfully lifted, Defendants have

599     acted entirely outside the bounds of due process and in direct

600     defiance of Michigan's judicial authority. Their conduct

601     amounts to a unilateral nullification of a binding court

602     judgment—an act that undermines both the rule of law and

603     core principles of federalism and separation of powers

604     embedded in the Constitution.

605             55)   Arbitrary and Irrational Conduct:

606     Defendants had no legitimate, lawful, or even rational basis for

607     their actions. There was—and remains—no statute, regulation,

608     or factual circumstance that justified continuing to treat Mr.

609     Jarrus as a prohibited person after the state court restored his

610     rights. The only explanation ever offered—that federal

611     authorities had not "cleared" him—is legally irrelevant and

612     unsupported by any statute or precedent. No law permits

613     federal delay or informal federal disapproval to override a

614     binding state court judgment. This arbitrary and baseless

615     conduct also violates the Equal Protection Clause, as Plaintiffs

616     were treated differently from similarly situated individuals

617     who obtained identical restoration orders—without any valid

31

618    reason, justification, or neutral criteria to support such unequal

619    treatment.

620                    56)    FOIA Obstruction and Evidence

621    Suppression: Defendants compounded their unlawful conduct

622    by attempting to cover it up. After Plaintiffs began filing FOIA

623    requests in early 2024 to gather information, Defendant

624    Fitzpatrick initially responded (on February 1, 2024) that "no

625    records" existed related to Mr. Jarrus's inquiries—a claim that

626    was patently false given the known interactions and the

627    existence of the court Order. Shortly thereafter, on February

628    13, 2024, Fitzpatrick sent a second response (to Ms. Jarrous's

629    request) that directly contradicted the first: she acknowledged

630    some records existed (including internal emails involving the

631    FBI) but refused to produce them, citing broad "law

632    enforcement" and "privacy" exemptions. These inconsistent

633    and misleading responses show a deliberate attempt to evade

634    transparency. Internally, ROPD officials (including Spencer

635    and Stanton) coordinated with federal agents to delete or

636    withhold critical evidence: for example, the lobby surveillance

637    video from mid-May 2024 was deleted outside of normal

638   retention policy, and an audio recording of a June 3, 2024

639   phone call between Spencer and Mr. Jarrus was edited to

640   remove a portion where Spencer made incriminating or hostile

641   remarks. This destruction and alteration of evidence was

642   intended to impede Plaintiffs' ability to prove their claims and

643   to shield Defendants from accountability. (see Exhibits c and f)

644         57)   Resulting Harm from Spoliation:The

645   destruction of the lobby surveillance video and the editing of

646   the phone call audio have materially prejudiced Plaintiffs'

647   ability to prove their claims. The missing lobby video would

648   have captured Deputy Chief Stanton's hostile and

649   confrontational behavior toward Mr. Jarrus—and potentially

650   revealed the presence or involvement of federal agents. The

651   removed segment of the June 3, 2024 phone call likely

652   contained tone, context, or incriminating statements that would

653   further demonstrate Defendants' retaliatory intent and unlawful

654   motives. As a result, Plaintiffs have been forced to rely on

655   memory, written notes, and circumstantial evidence instead of

656   the direct proof these recordings would have provided.

657    58)    In addition, Defendants' bad-faith FOIA

658    responses and deliberate concealment of responsive records

659    have imposed a significant and unnecessary burden on

660    Plaintiffs. Rather than receiving records through the normal

661    public process, Plaintiffs were forced to file multiple appeals,

662    re-submit requests, and ultimately bring this lawsuit—just to

663    access documents that should have been disclosed as a matter

664    of routine compliance. The cumulative effect of these actions

665    constitutes spoliation, obstruction, and a denial of due process.


666    59)    Chilling of First Amendment Rights:

667    Defendants' actions — including threats, surveillance, and

668    stonewalling — were taken in retaliation for Plaintiffs'

669    exercise of their First Amendment rights to petition and seek

670    redress. These retaliatory measures caused Plaintiffs

671    significant distress and would deter an ordinary person from

672    continuing to press their grievances. Despite this intimidation,

673    Plaintiffs persisted out of necessity to vindicate their rights, but

674    they did so at great personal cost (including stress-related

675    health effects, fear of further police retaliation, and emotional

676          turmoil).

677                    60)     Summary of Misconduct: In sum,

678          Defendants (often in concert with each other and with federal

679          agents) engaged in a deliberate campaign of: (a) defying a

680          court order; (b) arbitrarily denying permits and gun purchases;

681          (c) retaliating against Plaintiffs for complaining (through

682          threats and unwarranted surveillance); (d) destroying and

683          concealing evidence; and (e) frustrating Plaintiffs' attempts to

684          seek help (through bad-faith FOIA replies). Each aspect of this

685          campaign reinforced the others, resulting in an overarching

686          violation of Plaintiffs' constitutional rights.


687                         61)    Causes of Action


688          62)    COUNT I – Violation of Second Amendment (U.S.

689                 Constitution) and Article I, § 6 of Michigan Constitution

690                         (Right to Keep and Bear Arms)


691                    *63)    (42 U.S.C. § 1983 – Against Royal Oak*

692          *Police Department; Stanton, Spencer, Bonadeo, and*

693          *Fitzpatrick in their individual capacities; and Governor*

*Whitmer and Attorney General Nessel in their official*

694
695
*capacities for declaratory/injunctive relief)*

696                           64)    Incorporation of Allegations:

697 Plaintiffs re allege and incorporate by reference all preceding

698 paragraphs as if fully set forth herein. The facts detailed above

699 —including Defendants' knowing refusal to comply with a

700 valid state court Order restoring Plaintiff Michael Jarrus's

701 firearm rights; their coordinated efforts with federal agents to

702 perpetuate an unlawful disqualification; their retaliatory and

703 intimidatory conduct; and their destruction, redaction, and

704 concealment of evidence—constitute an ongoing and

705 intentional violation of Plaintiff Michael Jarrus's rights under

706 the Second Amendment to the U.S. Constitution and Article I,

707 § 6 of the Michigan Constitution. These deprivations persist to

708 this day, long after the legal restoration of rights, and remain

709 subject to immediate judicial redress.

710                           65)    38. Constitutional Protection Under Federal

711 and State Law:

712 The Second Amendment to the United States Constitution

36

713                     guarantees that "the right of the people to keep and bear Arms

714                     shall not be infringed." This fundamental right is fully

715                     incorporated against the states via the Fourteenth Amendment.

716                     *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *District*

717                     *of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court

718                     affirmed that this right belongs to law-abiding citizens for

719                     lawful purposes such as self-defense in the home. Most

720                     recently, in *New York State Rifle & Pistol Ass'n v. Bruen*, 142

721                     S. Ct. 2111 (2022), the Court made clear that any government

722                     restriction on firearms must be justified by a "historical

723                     tradition" of regulation consistent with the text and founding-

724                     era understanding of the right. After the April 2024 state court

725                     Order (Exhibit A-1), Plaintiff Michael Jarrus rejoined the class

726                     of law-abiding, responsible citizens to whom the Second

727                     Amendment applies in full. No federal or state statute currently

728                     disqualifies him.

729                              66)    Michigan's Constitution provides

730                     coextensive, and at times broader, protection. Article I, § 6

731                     guarantees: "Every person has a right to keep and bear arms

732                     for the defense of himself and the state." Under both

733    constitutions, Plaintiffs' rights have been unreasonably

734    infringed.

735                    67)    39. Unconstitutional Actions by State and

736    Local Officials:

737    Despite Plaintiff Jarrus's full restoration of rights, Defendants

738    —acting under color of law—have continued to block his

739    access to firearms by refusing to update state and federal

740    databases, denying permit applications, and maintaining false

741    prohibitor flags in LEIN and related systems. They have done

742    so not pursuant to any valid law or court ruling, but rather in

743    open defiance of judicial authority. This constitutes a de facto

744    firearm ban without legislative authority, legal justification, or

745    due process.

746                    68)    Additionally, Defendants denied Plaintiff

747    Linda Jarrous her independent right to keep and bear arms

748    under both the Second Amendment and Article I, § 6 of the

749    Michigan Constitution. She has no disqualifying history, yet

750    was prohibited from purchasing a firearm solely due to her

751    association with Plaintiff Jarrus and their shared residence.

752    This guilt-by-association disarmament is entirely unsupported

38

753   by statute or historical tradition and violates both state and

754   federal constitutional guarantees.

755        69)    Defendants' conduct is not only

756   unconstitutional—it is irreconcilable with the framework

757   mandated by *Bruen*. No historical tradition exists to support

758   disarming law-abiding individuals based on expired mental

759   health labels, court-terminated conservatorships, or third-party

760   associations. Plaintiffs remain unable to lawfully purchase or

761   possess firearms and are subject to continuing harm despite

762   clear judicial restoration.

        70)

763        71)    WHEREFORE (Count I):

764   Plaintiffs respectfully request that this Court:

765        72)    a. Declare that Defendants' actions have

766   violated Plaintiffs' rights under the Second Amendment to the

767   U.S. Constitution and Article I, § 6 of the Michigan

768   Constitution;

769        73)    b. Issue injunctive relief compelling

770   Defendants to (i) recognize and implement the state court

771 Order restoring Michael Jarrus's firearm rights, (ii) remove all

772 erroneous disqualifiers from relevant databases, and (iii) cease

773 any further interference with Plaintiffs' lawful exercise of their

774 rights;

775 74) c. Award compensatory and punitive

776 damages for the denial of fundamental rights, emotional

777 distress, reputational harm, and other injuries sustained;

778 75) d. Award costs and reasonable attorney's

779 fees under 42 U.S.C. § 1988;

780 76) e. And grant such other and further relief as

781 the Court deems just and proper.

782 77)

783 78)

784 79) COUNT II – Violation of Fourteenth Amendment (Due

785 Process) – Arbitrary Denial of Restored Rights

786 *80)  (42 U.S.C. § 1983 – Against All Defendants*

787 *involved in refusing to honor the restoration Order)*

40

788        81)    Incorporation of Allegations:

789    Plaintiffs incorporate by reference all preceding paragraphs as

790    if fully set forth herein.

791        82)    41. Refusal to Recognize Court Order as a

792    Due Process Violation:

793    Defendants' ongoing refusal to recognize and implement the

794    binding state court Order restoring Plaintiff Michael Jarrus's

795    firearm rights—despite having both actual and constructive

796    notice—constitutes a textbook violation of the Due Process

797    Clause of the Fourteenth Amendment. The Order nullified any

798    prior disability under 18 U.S.C. § 922(g)(4) and MCL 28.424.

799    By disregarding the judicial mandate and continuing to treat

800    Mr. Jarrus as a prohibited person, Defendants effectively

801    overrode the judiciary via administrative fiat—without

802    affording Plaintiff any opportunity for notice, hearing, or legal

803    rebuttal. This kind of extrajudicial deprivation violates the core

804    procedural protections articulated in *Goldberg v. Kelly*, 397

805    U.S. 254 (1970), and *Mathews v. Eldridge*, 424 U.S. 319

806    (1976). Moreover, the deliberate and arbitrary refusal to

807    implement a final court judgment rises to the level of a

41

808           substantive due process violation.

809                          83)     42. Deliberate Evasion and Collusion

810           (Exhibit C):

811           Internal communications (Exhibits C-1 through C-48)

812           demonstrate that Royal Oak Police Department officials—

813           including Defendants Stanton and Spencer—coordinated with

814           federal agents, including FBI Agent Melissa Heldreth and an

815           individual referred to as NICCOLAS GROCHOWSKI  to

816           circumvent the clear legal mandate of the court. Rather than

817           obey the restoration Order, ROPD chose to "wait on federal

818           clearance"—a position with no legal basis. This was not mere

819           oversight but an intentional subversion of a judicial decree,

820           undermining the rule of law and violating due process through

821           willful evasion and unlawful deference to informal,

822           extrajudicial opinions.

823                          84)     43. Improper Reliance on Non-

824           Disqualifying Records (Exhibits E):

825           Defendants' continued reliance on outdated CLEMS/LEIN

826           entries (Exhibits E-1 through E-10)—including references to a

827           terminated conservatorship and unrelated welfare checks—was

828            constitutionally impermissible. These records did not reflect

829            any current legal prohibition and should have been purged or

830            updated upon rights restoration. Using legally obsolete records

831            as a basis for denying constitutional rights is both arbitrary and

832            capricious, violating the Due Process Clause by weaponizing

833            administrative records that no longer have legal force.

834                       85)     44. Pattern of Arbitrary Permit Denials

835            (Exhibits D):

836            As shown in Exhibits D-1 through D-4, Plaintiffs were issued

837            multiple handgun purchase permit denials post-restoration.

838            These denials cited vague justifications such as "OCMI" or

839            "pending investigation," yet failed to provide any lawful basis,

840            supporting facts, or appeals mechanism. These acts constitute

841            repeated procedural due process violations: the arbitrary denial

842            of a protected liberty and property interest, without process,

843            notice, or explanation.

844                       86)     45. Lack of Notice or Opportunity to Be

845            Heard:

846            Defendants never provided Plaintiffs with formal notice, a

847            statement of reasons, or any process by which they could

848          contest the de facto reinstatement of disqualification. The

849          deprivation occurred entirely through opaque internal decision-

850          making and secretive communication between local and

851          federal agents. This systemic failure to offer a meaningful

852          opportunity to be heard violates procedural due process and

853          further exacerbates the constitutional injury.

854                    87)     46. Constructive Seizure of Rights and

855          Property (Fourth and Fourteenth Amendments):

856          While no firearm was physically confiscated, Defendants'

857          coordinated refusal to recognize Plaintiff's rights functioned as

858          a constructive seizure of both liberty and property. By

859          effectively banning Plaintiff Jarrus from owning firearms

860          despite court clearance—and by denying permit applications—

861          they asserted de facto control over constitutionally protected

862          property. This unauthorized control qualifies as an

863          unreasonable seizure under the Fourth Amendment, as applied

864          to the states via the Fourteenth Amendment.

865                    88)     47. Independent Due Process Violations

866          Against Plaintiff Linda Jarrous:

867          Plaintiff Linda Jarrous, who has no disqualifying condition or

868    criminal record, was unlawfully denied the right to acquire a

869    firearm based solely on her familial relationship with Mr.

870    Jarrus and their shared residence. This guilt-by-association

871    theory—unsupported by law or policy—violates both

872    procedural and substantive due process. No hearing, no finding

873    of risk, and no lawful authority justified her disarmament.

874              89)    . Lack of Any Rational or Legal

875    Justification:

876    Defendants have failed to identify any statute, regulation, or

877    policy authorizing their continued obstruction of Plaintiffs'

878    rights. No court order, federal law, or Michigan statute

879    justified their actions. Their refusal to comply was animated by

880    animus, retaliation, and institutional defiance of judicial

881    authority—not legal necessity. Such actions not only violate

882    due process, but also the Equal Protection Clause of the

883    Fourteenth Amendment, which prohibits government officials

884    from singling out individuals for adverse treatment absent a

885    rational basis.

886        90)    WHEREFORE (Count II):

887    Plaintiffs respectfully request that this Court:

888              91)    Declare that Defendants' refusal to

889    recognize and implement the lawful state court Order restoring

890    Plaintiff Jarrus's firearm rights constitutes a violation of the

891    Due Process and Equal Protection Clauses of the Fourteenth

892    Amendment;

893              92)    Issue injunctive relief compelling

894    Defendants to correct all databases, eliminate any residual

895    disqualifying status, and cease any further obstruction of

896    Plaintiffs' lawful rights;

897              93)    Award compensatory and punitive damages

898    for the harms caused, including emotional distress,

899    reputational harm, and the chilling of constitutionally protected

900    activity;

901              94)    And grant any other relief the Court deems

902    just and proper.

903

904

905          95)    COUNT III – Violation of Fourteenth Amendment:

906                  Procedural Due Process & Equal Protection

907             96)   (42 U.S.C. § 1983 – Against All Defendants)

908                97)   Incorporation of Allegations:

909   Plaintiffs reallege and incorporate all preceding paragraphs as

910   if fully stated herein.

911                98)   50. Deprivation of Protected Interests:

912   Defendants deprived Plaintiffs of multiple protected liberty

913   and property interests without the procedural safeguards

914   required by the Due Process Clause of the Fourteenth

915   Amendment. Plaintiff Michael Jarrus held a legitimate liberty

916   and property interest in his right to possess firearms following

917   the issuance of a valid Michigan state court Order restoring

918   those rights. That judicial determination created a vested legal

919   entitlement that could not be undone absent lawful process.

920   The Sixth Circuit has recognized that restored firearm rights

921   constitute a protected interest under the Due Process Clause.

47

922    See *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 699–
923    700 (6th Cir. 2016) (en banc) (EXHIBIT P COMPLIANCE
924    WITH TYLER). Yet Defendants subverted that court order
925    through informal interference, database manipulation, and
926    extrajudicial refusals—none of which afforded Plaintiff notice,
927    a hearing, or legal justification.

928    99)    Similarly, Plaintiff Linda Jarrous was
929    denied both access to public records and the lawful acquisition
930    of a firearm—rights protected by Michigan statute and federal
931    constitutional principles. She was obstructed from acquiring
932    property (a firearm) and denied access to government
933    information under the Michigan FOIA statute, both without
934    any individualized finding of disqualification. Instead, she was
935    effectively punished for her association with Mr. Jarrus, not for
936    any conduct or condition of her own. These denials were
937    carried out with no formal adjudication or hearing, violating
938    core due process guarantees.

939    100)    . Arbitrary and Dishonest Conduct:
940    Defendants did not merely fail to provide lawful procedures—
941    they replaced them with deceit and obstruction. Mr. Jarrus was

942   given no notice, explanation, or path for redress; instead, he

943   was ignored, stonewalled, and denied his rights through covert

944   coordination with federal agents and suppression of his court-

945   ordered restoration. Ms. Jarrous was misled through

946   contradictory FOIA responses: Mr. Jarrus was falsely told no

947   records existed; days later, Ms. Jarrous was told the records

948   did exist but were exempt. This pattern of evasiveness and

949   deception deprived both Plaintiffs of notice, reasoned

950   explanation, and a forum to challenge the government's

951   actions—violating even the most basic tenets of due process.

952   When government officials offer misinformation in lieu of

953   process, or deliberately frustrate legal rights through

954   misdirection, they nullify the constitutional protections to

955   which every citizen is entitled.

956             101)   Equal Protection Violation:

957   Defendants' actions also violated the Equal Protection Clause.

958   Plaintiffs were treated differently from others similarly situated

959   —namely, individuals who had not exercised their legal rights

960   or challenged government actors. There exists no rational basis

961   for the refusal to update Mr. Jarrus's status following a valid

49

962      state court order, nor for the contradictory FOIA responses

963      issued within days of each other. These departures from

964      standard practice were not based on legitimate government

965      interests, but on animus and retaliation against Plaintiffs for

966      asserting their rights. Such arbitrary and selective enforcement

967      constitutes a clear equal protection violation, as government

968      officials cannot lawfully penalize citizens based on disfavored

969      associations or the lawful invocation of civil rights.

970      102)    Damage and Relief:

971      As a direct and proximate result of Defendants' violations of

972      procedural due process and equal protection, Plaintiffs have

973      suffered ongoing and compounding harm: denial of legal

974      rights, mental anguish, reputational injury, exacerbation of

975      Plaintiff Jarrus's multiple sclerosis symptoms due to stress,

976      and unnecessary legal and financial burdens. These injuries

977      were not incidental—they were foreseeable consequences of

978      Defendants' deliberate acts. Plaintiffs respectfully request

979      declaratory relief finding that their constitutional rights under

980      the Fourteenth Amendment were violated, injunctive relief

981      barring further obstruction or retaliation, and compensatory

982    and punitive damages sufficient to address the harm suffered

983    and deter future misconduct.

984

985         103)  COUNT IV – First Amendment Retaliation

986         *104)  (42 U.S.C. § 1983 – Against All Defendants who*

987              *participated in retaliatory acts)*

988              105)    Incorporation of Allegations:

989    Plaintiffs reallege and incorporate by reference all prior

990    paragraphs as if fully set forth herein. This Count arises from

991    Defendants' deliberate retaliation against Plaintiffs for

992    engaging in activity protected under the First Amendment to

993    the U.S. Constitution and Article I, § 5 of the Michigan

994    Constitution—including the rights to free speech, to petition

995    the government for redress, and to obtain public information.

996              106)    Protected Activities:

997    Plaintiffs exercised their constitutional rights by:

998              107)    (a) Filing internal complaints with Royal

51

999        Oak Police and city officials regarding their refusal to follow a

1000       valid court order and misconduct by officers;

1001                    108)    (b) Submitting multiple FOIA requests in

1002       January and February 2024 to uncover potential misconduct

1003       and demand transparency;

1004                    109)    (c) Meeting directly with ROPD officials,

1005       delivering certified copies of the court order, and attempting to

1006       resolve the matter through lawful, civil dialogue; and

1007                    110)    (d) Filing a formal FOIA appeal to the City

1008       Manager on June 10, 2024, outlining improper and evasive

1009       conduct in the FOIA responses.

1010                    111)    Each of these actions is squarely protected

1011       by the First Amendment's guarantees of free speech and the

1012       right to petition government for redress (see *Peterson v. City of*

1013       *Wyoming*, 801 F. App'x 418, 423–24 (6th Cir. 2019)).

1014                    112)    Adverse Actions in Retaliation:

1015       In direct response to these protected activities, Defendants

1016       engaged in a calculated campaign of retaliation designed to

1017       punish Plaintiffs and discourage further assertion of their

52

1018      rights. These retaliatory actions included:

1019            113)    Withholding and Destroying Records:

1020      Immediately after Plaintiffs submitted FOIA requests and filed

1021      internal complaints, Defendants conspired to delete or conceal

1022      critical evidence. Spencer and Stanton discussed obstructing

1023      the release of lobby video footage—and it was ultimately

1024      destroyed, in violation of record retention rules. Likewise, the

1025      audio recording of Mr. Jarrus's phone call with Spencer was

1026      altered, with key portions removed. These were not innocent

1027      mistakes; they were willful acts of spoliation intended to

1028      prevent Plaintiffs from substantiating their claims.

1029            114)    Issuing False and Misleading FOIA

1030      Responses:

1031      Fitzpatrick's FOIA responses on February 1 and February 13,

1032      2024, were clearly retaliatory. The first falsely claimed no

1033      records existed. The second response, sent only after persistent

1034      follow-up, cited vague and improper exemptions. These

1035      contradictory and evasive answers signaled to Plaintiffs that

1036      their efforts were unwelcome and futile. The inconsistencies

1037      and stonewalling were designed to deter further pursuit.

1038          115)   Hostile and Intimidating Statements:

1039          During in-person follow-ups, Stanton and Bonadeo made

1040          statements such as: "You're not getting your rights back...

1041          especially not here," and "stop wasting our time." Spencer, on

1042          the call with Mr. Jarrus, responded with overt hostility,

1043          captured in part before the audio was edited. These statements,

1044          particularly given the context of Plaintiffs lawfully asserting

1045          their rights, were clearly intended to intimidate and silence.

1046          116)   Surveillance and Intimidation:

1047          Following Plaintiffs' FOIA requests and complaints, ROPD

1048          patrol cars began circling the Plaintiffs' residence at unusual

1049          intervals, despite no calls for service. This passive-aggressive

1050          tactic is a known method of law enforcement intimidation—

1051          subtle but chilling. The message was unmistakable: "We're

1052          watching you."

1053          117)   Coordinated Refusal to Comply with Court

1054          Orders:

1055          Emails obtained via FOIA show that as Plaintiffs ramped up

1056          their efforts, Royal Oak officials reached out to FBI Agent

1057          Heldreth and NICCOLAS GROCHOWSKI  to coordinate a

1058   joint strategy of obstruction. Instead of correcting the records

1059   or complying with the restoration order, Defendants escalated

1060   their defiance—digging in further, delaying, denying, and

1061   deferring to federal input as an excuse to continue violating

1062   Plaintiffs' rights. This increased coordination in response to

1063   Plaintiffs' persistence is itself retaliatory. (see exhibit c )

1064   118)   Chilling Effect and Harm:

1065   These actions would unquestionably chill a person of ordinary

1066   firmness from continuing to engage in protected speech and

1067   petitioning. Plaintiffs reasonably feared further obstruction,

1068   escalation, or targeting. Despite their persistence, they

1069   experienced real harm—heightened stress, anxiety, sleep

1070   disruption, and in Mr. Jarrus's case, exacerbation of his

1071   multiple sclerosis symptoms (including eye twitching and

1072   fatigue). These are foreseeable consequences of retaliatory

1073   conduct.

1074   119)   Importantly, the First Amendment does not

1075   require that a person actually stop asserting their rights for a

1076   claim to succeed—it is enough that Defendants' conduct was

1077   capable of deterring someone from doing so (*Thaddeus-X v.*

55

1078            *Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc)).

1079                         120)   Direct Causation:

1080            Plaintiffs' protected ativities were a substantial or motivating

1081            factor behind the adverse actions taken by Defendants. The

1082            timing is telling: Defendants had ample opportunity to comply

1083            with the 2016 conservatorship termination and the April 2024

1084            restoration order—but only began deleting evidence and

1085            obstructing processes when Plaintiffs became active in filing

1086            FOIA requests and complaints. Internal emails (Exhibit C)

1087            show that after FOIA was filed, Spencer wrote "legal will

1088            handle it—likely we'll deny," confirming a retaliatory mindset.

1089                         121)  Stanton's remark, "You're not getting a gun

1090            on my watch," made in mid-May 2024, aligns directly with

1091            Plaintiffs' escalating efforts to enforce the court order and

1092            obtain records. These retaliatory acts were not coincidental—

1093            they were causally linked to Plaintiffs' protected speech.

1094                         122)   No Legitimate Basis for Defendants'

1095            Conduct:

1096            Defendants cannot point to any lawful reason for their actions.

1097            There was no criminal investigation, no pending charges, and

1098      no legal justification for deleting evidence, misrepresenting

1099      FOIA results, or rejecting gun permit applications post-

1100      restoration. In the absence of a legitimate basis, the retaliatory

1101      motive is even more apparent (*Hartman v. Moore*, 547 U.S.

1102      250 (2006)).

1103               123)   Damages:

1104      As a direct result of the retaliation, Plaintiffs suffered concrete,

1105      measurable harm. They incurred time, costs, and emotional

1106      injury—including stress-related health complications and

1107      mental anguish. They seek compensatory damages, including

1108      for physical flare-ups tied to stress. Plaintiffs also request

1109      punitive damages to punish this intentional misconduct and

1110      deter future retaliatory action by law enforcement.

1111

1112           124)   COUNT V – Violation of MCL 700.5107 and MCL

1113      765.6b (State Law) – Failure to Remove Plaintiff from LEIN

1114      Following Termination of Disability and Rights Restoration

1115      *125)   (Against Royal Oak Police Department, Michigan State*

57

1116             *Police, and Responsible Officials)*

1117                         126)    Incorporation of Allegations:

1118     Plaintiff Michael Jarrus incorporates by reference all preceding

1119     paragraphs as if fully set forth herein.

1120                         127)     Termination of Conservatorship – MCL

1121     700.5107:

1122     On June 16, 2016, the Oakland County Probate Court formally

1123     closed Plaintiff's conservatorship proceeding, terminating any

1124     court-supervised disability status (Exhibit A-2). Pursuant to

1125     MCL 700.5107(2)(c), such termination requires the court to

1126     issue all appropriate orders to conclude the proceeding,

1127     including the implicit obligation to restore the individual's

1128     rights and ensure removal from law enforcement databases

1129     reflecting any prior incapacity. Yet, Plaintiff's LEIN record

1130     remained flagged with a mental health disqualifier, despite the

1131     legal termination of all disqualifying conditions. Whether this

1132     flag was never removed, was re-entered without basis, or was

1133     left intentionally, the continued presence of that entry after

1134     2016 violated Michigan law.

1135
1136

128)    Restoration Order – MCL 28.424 and MCL 765.6b:

1137 On top of the 2016 closure, Plaintiff obtained a formal 2024
1138 state court Order explicitly restoring his firearm rights (Exhibit
1139 A-1). Under MCL 28.424(4), such an order must be
1140 transmitted to law enforcement and the state police for
1141 immediate record correction. Although MCL 765.6b pertains
1142 to pretrial conditions, it reflects a general principle applicable
1143 here: once a firearm restriction is lifted by judicial order, law
1144 enforcement has a mandatory duty to update LEIN records
1145 without delay. Defendants' failure to correct LEIN in light of
1146 the 2024 restoration order—despite being in possession of
1147 certified copies—constitutes a direct and ongoing violation of
1148 both statutes.

1149 129)    Unlawful Retention of LEIN Disqualifier:
1150 Despite no active disability and a court-ordered restoration,
1151 Defendants continued to maintain a "mental health" flag or
1152 other disqualifying entry in LEIN. That unlawful retention
1153 served as the basis for repeated denials of purchase permits
1154 and was used by both local and federal actors to justify

obstructing Plaintiff's Second Amendment rights. Under Michigan law, once the legal basis for a disqualification is terminated, the database entry must be purged or updated immediately. Defendants' refusal to do so was neither lawful nor excusable—it directly violated MCL 700.5107, MCL 28.424, and the spirit of MCL 765.6b.

130)    FOIA Evidence of Noncompliance – Exhibits                    B                    &                    C: FOIA correspondence (Exhibits B-1 through B-10) confirms that Defendants were repeatedly asked to provide documentation of any action taken to update or remove Plaintiff's LEIN status after the 2024 court order. No such documentation was ever produced. Internal communications (Exhibits C-1 through C-48) show officials discussing deletion of bodycam footage and evasion of FOIA disclosures, reinforcing that no lawful effort was made to comply with statutory duties. These communications suggest Defendants were not merely negligent, but knowingly attempting to preserve an unlawful prohibition while concealing their failure to update LEIN records.

60

1175                   131)     Statutory Duties and Legal Framework:

1176           MCL 700.5107(2)(c) compels termination of all effects of a

1177           conservatorship, including firearm disqualifications. MCL

1178           28.424(4) mandates that firearm rights restoration orders be

1179           promptly transmitted to law enforcement for updating of all

1180           applicable records. MCL 765.6b(5) reinforces this duty by

1181           requiring "immediate" notification to LEIN once a restriction

1182           is lifted. Together, these laws form a clear legislative intent:

1183           once a person is legally eligible, no agency may continue

1184           treating them as prohibited. Defendants' inaction—or

1185           deliberate obstruction—violated this framework and created

1186           substantial, ongoing harm.

1187                   132)     Dereliction or Deliberate Obstruction:

1188           Defendants' conduct can only be explained in one of two

1189           ways:

1190           (a) gross negligence in failing to act on legal restoration

1191           documents,                                         or

1192           (b) intentional obstruction aimed at denying Plaintiff's rights.

1193           Both constitute violations of Michigan law. Certified copies of

1194           the 2024 restoration order were delivered to all relevant

agencies. Whether ignored or defied, Defendants breached their duty, undermined judicial authority, and weaponized outdated data to continue infringing on Plaintiff's rights.

133) Consequences of Violation: The ongoing LEIN disqualifier prevented Plaintiff from passing background checks, blocked multiple permit applications, and left him falsely labeled as mentally ineligible. These consequences were not minor clerical errors—they were direct, repeated violations of state law, which entitles Plaintiff to a LEIN record free of false or expired restrictions once judicially restored. This statutory failure also served as a basis for further constitutional violations as alleged in other counts.

134) HarmtoPlaintiff: As a direct and foreseeable result of Defendants' violations of MCL 700.5107 and MCL 765.6b, Plaintiff suffered legal, reputational, and emotional injury. He was treated by law enforcement as ineligible despite a lawful restoration order, denied access to his constitutional rights, and subjected to frustration, anxiety, and humiliation. These harms are independently actionable under state law and amplify the

1215          constitutional injuries detailed throughout this Complaint.

---

1216          **135)** WHEREFORE (Count V):

1217          136) Plaintiff   Michael   Jarrus   respectfully

1218    requests       that       this       Honorable       Court:

1219    (a) Declare that Defendants violated MCL 700.5107 and MCL

1220    765.6b by failing to remove disqualifying LEIN entries after

1221    the          lawful          restoration          of          rights;

1222    (b) Issue injunctive relief requiring immediate correction of all

1223    law enforcement databases to accurately reflect Plaintiff's

1224    current       legal       status       and       firearm       eligibility;

1225    (c) Award compensatory damages for reputational harm,

1226    emotional distress, and loss of rights caused by unlawful LEIN

1227    retention;

1228    (d) Award punitive damages against the City of Royal Oak and

1229    other   responsible   entities   for   knowingly   or   recklessly

1230    perpetuating              these              violations;

1231    (e) Award reasonable costs and fees as permitted by law; and

1232    (f) Grant such further relief as this Court deems just and

1233        proper.

1234                    137)  In the alternative, if this Court declines to

1235        exercise supplemental jurisdiction over this state-law claim,

1236        Plaintiff expressly reserves the right to refile this Count in

1237        Michigan state court pursuant to 28 U.S.C. § 1367(d).

1238    138)

1239                    139)  COUNT VI – Joint Action and Conspiracy Between

1240                                State and Federal Officials

1241                *140)  (42 U.S.C. § 1983 – Violation of Constitutional Rights*

1242                *Under Color of Law; Against All State/Local Defendants who*

1243                            *acted in concert with federal agents)*

1244                    141)  Incorporation of Allegations: Plaintiffs

1245        incorporate by reference all preceding paragraphs as if fully

1246        restated herein.

1247                    142)  § 1983 Liability for Joint Action: any

1248        person who, acting under color of state law, deprives another

1249        of constitutional rights is liable for that violation. This liability

1250        extends not only to state actors, but also to federal officials or

1251        private individuals who conspire with, or act jointly alongside,

1252        state officials. When federal agents coordinate with state or

1253        local entities in carrying out unconstitutional acts, they may be

1254        treated as acting "under color of state law" for purposes of §

1255        1983 liability (see *Dennis v. Sparks*, 449 U.S. 24 (1980);

1256        *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). In this

1257        case, Defendants Heldreth, Kirkpatrick, and NICCOLAS

1258        GROCHOWSKI (and his team) worked hand-in-hand with

1259        Royal Oak officials — including Defendants Stanton, Spencer,

1260        Bonadeo, and Fitzpatrick — to unlawfully deprive Plaintiffs of

1261        their constitutional rights. Because this was a coordinated and

1262        intentional joint effort, all parties involved — both federal and

1263        local — are properly held liable under § 1983..

1264                    143)  Agreement and Shared Objective:The

1265        record demonstrates a clear meeting of the minds between

1266        federal and local actors who shared a common goal: to defy

1267        the valid state court restoration Order, obstruct Plaintiff

1268        Michael Jarrus's ability to obtain firearms, and shield their

1269        coordinated misconduct from both judicial oversight and

1270          public accountability. This conspiracy is evidenced by repeated

1271          inter-agency communications, mutual reliance on each other's

1272          unlawful decisions, and synchronized efforts to block

1273          Plaintiffs' rights. Local Defendants deferred to federal agents

1274          instead of following Michigan law, while federal agents leaned

1275          on local authorities to carry out enforcement, forming a

1276          seamless joint operation intended to suppress the lawful

1277          exercise of constitutional rights and avoid transparency.

1278                    144)  Overt Acts in Furtherance of

1279          Conspiracy:Multiple overt acts were committed by members

1280          of this conspiracy in furtherance of its unlawful objectives,

1281          including but not limited to: (a) maintaining Mr. Jarrus's

1282          prohibited status in state (LEIN) and federal (NICS) databases

1283          despite a valid court order restoring his rights; (b) denying his

1284          handgun purchase permit applications without lawful basis; (c)

1285          falsely informing Plaintiffs that federal authorities had

1286          overruled the restoration—stating, for example, "the FBI

1287          hasn't cleared you"; (d) deliberately destroying key video and

1288          audio evidence, including lobby surveillance and a recorded

1289          phone call; and (e) issuing false and misleading FOIA

1290     responses to prevent discovery of the federal-local

1291     coordination. Each of these acts materially advanced the

1292     conspiracy's purpose, directly injured Plaintiffs, and

1293     independently gives rise to liability under 42 U.S.C. § 1983

1294     and applicable state law.

1295                         145)  Exhibit C Communications:Internal emails

1296     disclosed through FOIA (Exhibits C-1 through C-48) provide

1297     direct evidence of the conspiracy. These records reveal

1298     repeated coordination with NICCOLAS GROCHOWSKI  and

1299     his team," deference to FBI Agent Heldreth's informal

1300     assessments of Plaintiff's legal status, and deliberate planning

1301     to obstruct FOIA compliance. In one email dated

1302     approximately May 17, 2024, Deputy Chief Spencer stated:

1303     "Legal will handle any FOIA — likely we'll deny. Karen, draft

1304     up something about retention if needed," following direct

1305     communication with federal agents. This exchange, among

1306     others, shows that state and federal actors were actively

1307     working together to craft misleading responses, suppress

1308     records, and continue depriving Plaintiffs of their rights—all

1309     under the color of law. (EXHIBIT C)

1310        146)  Joint Constitutional Violations: This

1311    coordinated effort between local and federal actors resulted in

1312    multiple constitutional violations: Plaintiffs' Second

1313    Amendment rights were infringed when Mr. Jarrus was

1314    unlawfully barred from firearm ownership despite full

1315    eligibility; their First Amendment rights were violated through

1316    retaliation for protected activity, including the filing of

1317    complaints and FOIA requests; and their Fourteenth

1318    Amendment rights were trampled through a denial of due

1319    process and equal protection. Neither the local nor federal

1320    officials could have accomplished these deprivations on their

1321    own—only through their joint enterprise, acting under color of

1322    state law, were they able to sustain the extended and unlawful

1323    suppression of Plaintiffs' rights.

1324        147)  Liability of Co-Conspirators: Each

1325    Defendant who joined or participated in the conspiracy is

1326    liable for the foreseeable acts of every other co-conspirator

1327    taken in furtherance of the common objective. Thus, for

1328    example, the City of Royal Oak and its officials are

1329    accountable not only for their own actions but also for the acts

1330    of their federal co-conspirators (and vice versa) that resulted in

1331    the constitutional injuries to Plaintiffs. This joint liability

1332    ensures that state officials cannot escape responsibility by

1333    hiding behind federal direction, and federal actors cannot

1334    immunize unconstitutional conduct by operating through state

1335    proxies.

1336    148)  COUNT VII – Violation of Article I, § 6 of the Michigan

1337          Constitution (Right to Keep and Bear Arms)

1338          *149)  (Against State and Local Defendants)*

1339                 150)   ncorporation of Allegations:

1340    Plaintiffs incorporate by reference all preceding paragraphs as

1341    if fully set forth herein.

1342                 151)   77. Violation of Michigan Constitutional

1343    Right:

1344    Defendants have violated Plaintiffs' rights under Article I, § 6

1345    of the Michigan Constitution, which guarantees that "[e]very

1346    person has a right to keep and bear arms for the defense of

1347    himself and the state." Despite a valid state court order

69

1348    restoring Plaintiff Michael Jarrus's firearm rights and

1349    confirming his eligibility under Michigan law, Defendants—

1350    including Royal Oak officials, the Michigan State Police, and

1351    associated state actors—unlawfully and repeatedly denied him

1352    the ability to possess, purchase, or register firearms.

1353            152)  This violation was compounded by the

1354    arbitrary and retaliatory denial of related rights to his mother,

1355    Plaintiff Linda Jarrous, based solely on her association with

1356    Mr. Jarrus and past, irrelevant incidents in which neither

1357    plaintiff was convicted of a crime or adjudicated dangerous.

1358            153)  Defendants' persistent obstruction—

1359    reflected in:

1360            154)  refusal to remove Mr. Jarrus from

1361    disqualifying databases (including LEIN and CLEMS),

1362            155)  misdirection regarding appeal procedures,

1363            156)  and unjustified permit denials despite clear

1364    statutory compliance—

1365            157)  constitutes a continuing violation of the

1366    Michigan Constitution. These actions amount to an

70

1367     administrative nullification of Plaintiff Jarrus's rights without

1368     due process or legal justification.

1369          158)   While the Michigan Constitution does not

1370     provide an automatic private right of action for damages

1371     against the State, Plaintiffs are entitled to declaratory and

1372     injunctive relief under state constitutional principles and the

1373     doctrine of equitable enforcement, as recognized in cases such

1374     as *Jones v. Powell*, 462 Mich. 329 (2000).

             159)

1375          160)   WHEREFORE (Count VII):

1376     Plaintiffs respectfully request that this Court:

1377          161)   (a) Declare that Defendants' conduct—

1378     including the continued denial and obstruction of lawful

1379     firearm rights to Plaintiffs—violated Article I, § 6 of the

1380     Michigan Constitution;

1381          162)   (b) Issue injunctive relief compelling

1382     Defendants to cease all interference with Plaintiffs' lawful

1383     rights to possess and purchase firearms, including an order to:

1384          163)   Correct and update all relevant state and

1385         local databases;

1386                        164)  Issue purchase permits or otherwise honor

1387     Mr. Jarrus's restored rights;

1388                        165)  Remove any disqualifying labels, entries, or

1389     flags from Plaintiff Jarrous's records not supported by law;

1390                        166)   (c) Grant such other and further relief,

1391     including equitable remedies, as may be necessary to vindicate

1392     Plaintiffs' constitutional rights and ensure compliance by state

1393     and local officialsI.

1394     167)

1395     168)  COUNT VIII – Municipal Liability (Monell Claim) –

1396                        Unconstitutional Policy or Custom

1397     *169)  (42 U.S.C. § 1983 – Against Defendant City of Royal*

1398                        *Oak (Royal Oak Police Department))*

1399                        170)   78. Incorporation of Allegations:

1400     Plaintiffs incorporate by reference all prior allegations as if

1401     fully set forth herein.

1402      171)   79. Policy, Custom, or Deliberate

1403      Indifference:

1404      The constitutional violations described above—including

1405      deprivation of Second and Fourteenth Amendment rights,

1406      retaliation, obstruction of lawful processes, FOIA violations,

1407      and evidence destruction—were directly and proximately

1408      caused by the policies, customs, and deliberate indifference of

1409      the City of Royal Oak, acting through its agents in the Royal

1410      Oak Police Department (ROPD). The conduct of senior

1411      officials, including Deputy Chiefs Stanton and Spencer,

1412      evidences an unconstitutional policy or deeply entrenched

1413      practice of:

1414      172)   Retaliating against individuals who

1415      challenge police actions or seek to assert their rights under the

1416      Second Amendment or state law;

1417      173)   Ignoring or defying valid state court orders

1418      restoring firearm rights;

1419      174)   Providing false or misleading FOIA

1420      responses and obstructing access to public records;

1421          175)  Withholding, deleting, or editing evidence

1422    to avoid accountability;

1423          176)  Misinforming applicants regarding appeal

1424    procedures and gun rights restoration processes.

1425          177)  These practices were not isolated incidents,

1426    but repeated acts involving multiple senior officers, suggesting

1427    the existence of an organizational norm or tolerated custom.

1428          178)   80. Failure to Train, Supervise, and

1429    Discipline:

1430    The City of Royal Oak also exhibited deliberate indifference to

1431    the constitutional rights of its residents by failing to properly

1432    train, supervise, or discipline its officers regarding:

1433          179)  Compliance with firearm rights restoration

1434    under MCL 28.424 and related state/federal law;

1435          180)  Proper handling of FOIA requests and

1436    records retention obligations under MCL 15.233 and MCL

1437    750.491;

1438          181)  Respecting constitutional rights, including

1439    due process, access to courts, and equal protection.

74

1440             182)   As articulated in *City of Canton v. Harris*,

1441  489 U.S. 378 (1989), a municipality's failure to train or

1442  supervise may give rise to liability where such failure reflects

1443  deliberate indifference to constitutional rights. Here, the City's

1444  failure allowed repeated rights violations to persist unchecked.

1445             183)   81. Pattern, Knowledge, and Moving Force:

1446  The actions of ROPD leadership—specifically Stanton,

1447  Spencer, Bonadeo, and others—demonstrate that these

1448  violations were not random or unauthorized, but rather part of

1449  a pattern of official misconduct known to, or ratified by, the

1450  City. These officials:

1451             184)  Verbally declared that Plaintiff would

1452  "never get [his] rights back in the city,"

1453             185)  Made decisions in coordination with non-

1454  city actors (including FBI personnel) to block gun rights

1455  restoration,

1456             186)  Obstructed Plaintiffs' FOIA requests and

1457  tampered with audio and video evidence.

1458             187)   This widespread misconduct, repeated

75

1459        across different types of interactions (gun permit applications,

1460        FOIA requests, complaints, and appeals), demonstrates the

1461        existence of a policy or custom that was the moving force

1462        behind Plaintiffs' injuries.

1463        188)    The City's failure to correct, investigate, or

1464        punish these violations also constitutes ratification of the

1465        unlawful conduct. Under *Monell v. Dep't of Soc. Servs.*, 436

1466        U.S. 658 (1978), such policies, customs, or official decisions

1467        made by final policymakers render the municipality liable for

1468        the resulting constitutional deprivations.

1469        189)    WHEREFORE (Count VIII):

1470        Plaintiffs respectfully request that this Court:

1471        190)    (a) Declare that Defendant City of Royal

1472        Oak is liable under 42 U.S.C. § 1983 for maintaining

1473        unconstitutional policies, customs, or failing to train and

1474        supervise its employees, which were the moving force behind

1475        Plaintiffs' constitutional injuries;

1476        191)    (b) Enter judgment against the City for

1477        compensatory and punitive damages arising from the City's

1478        ratification of misconduct and deliberate indifference;

1479                    192)   (c) Grant injunctive relief requiring the City

1480        to implement constitutionally compliant policies and training

1481        procedures regarding firearm rights, FOIA compliance, and

1482        evidence retention;

1483                    193)   (d) Award reasonable costs and attorney's

1484        fees under 42 U.S.C. § 1988; and

1485                    194)   (e) Grant such other relief as this Court

1486        deems just and appropriate to deter future misconduct and

1487        ensure accountability.

1488

1489        195)  COUNT IX – Denial of Access to Courts (Evidence

1490                Spoliation) – Fourteenth Amendment, and Violation of

1491                        Michigan Freedom of Information Act

1492        *196)  (42 U.S.C. § 1983 – Against Stanton, Spencer, Bonadeo,*

1493        *Fitzpatrick, and the City of Royal Oak for evidence spoliation;*

1494        *and supplemental state-law claims under Michigan's FOIA)*

1495          197)  Incorporation of Allegations: Plaintiffs

1496       incorporate all preceding paragraphs as if fully set forth herein.

1497          198)  Denial of Access to Courts (Evidence

1498       Spoliation): Spoliation and Suppression of Evidence:

1499       Defendants Stanton, Spencer, Bonadeo, and Fitzpatrick, acting

1500       under color of state law, intentionally destroyed and concealed

1501       critical evidence necessary for Plaintiffs to assert and prove

1502       their claims, thereby violating their rights under the Fourteenth

1503       Amendment, which guarantees meaningful access to the

1504       courts. Specifically, lobby surveillance video from May 2024

1505       —capturing a key encounter—was deleted, and audio from a

1506       phone call between Deputy Chief Spencer and Mr. Jarrus was

1507       edited to remove incriminating remarks. These actions

1508       occurred at a time when litigation was not only reasonably

1509       foreseeable but already underway—Plaintiffs had submitted

1510       FOIA requests, filed internal complaints, and were actively

1511       preparing to initiate legal proceedings. The spoliation and

1512       suppression of this evidence directly obstructed Plaintiffs'

1513       ability to litigate their claims, constituting a denial of due

1514       process and a clear violation of the constitutional right to seek

78

1515     redress through the courts.

1516     199)  Michigan FOIA Violations: Defendant

1517     Fitzpatrick (and by extension the City of Royal Oak) violated

1518     Michigan's Freedom of Information Act, MCL 15.231 et seq.,

1519     by processing Plaintiffs' FOIA requests in bad faith. As

1520     detailed earlier, Fitzpatrick issued a false "no records" denial

1521     to Mr. Jarrus and a factually unsupported, overly broad

1522     exemption-based denial to Ms. Jarrous. These actions violated

1523     FOIA's requirements to conduct a reasonable search and to

1524     disclose non-exempt public records. Additionally, other Royal

1525     Oak officials (including Marcum and Bonadeo) participated in

1526     or approved these improper responses. Under Michigan law,

1527     Plaintiffs have a right to the records and to be free from

1528     arbitrary and capricious denial of their requests.

1529     200)  Injury from Spoliation and Withholding:

1530     Plaintiffs have been prejudiced by Defendants' spoliation and

1531     obstruction. The missing video would have provided direct,

1532     visual evidence of Stanton's confrontational conduct and

1533     possibly any FBI involvement during Mr. Jarrus's visit, and the

1534     excised portion of the audio call (EXHIBIT AR-1) likely

1535      contained statements by Spencer evidencing animus or

1536      admissions. Losing this evidence forces Plaintiffs to rely on

1537      memory and secondary evidence, weakening the presentation

1538      of their case. Additionally, the stress and delay caused by

1539      Defendants' FOIA stonewalling forced Plaintiffs to incur costs

1540      (mailings, appeals, and this lawsuit) and caused frustration and

1541      a loss of faith in public institutions.

1542           201)  Ongoing Duty to Preserve and Disclose: At

1543      all relevant times, Defendants had a duty under law to preserve

1544      the records in question and to disclose them upon request.

1545      Michigan's FOIA and records retention laws prohibit the

1546      destruction of public records once a request is made or

1547      anticipated (see MCL 15.233 and MCL 750.491). By willfully

1548      destroying and refusing to produce records, Defendants not

1549      only violated Plaintiffs' rights but also undermined the

1550      integrity of the judicial process.


1551           202)  WHEREFORE (Count IX): Plaintiffs

1552      respectfully request that this Court: (a) declare that

1553      Defendants' deliberate destruction and withholding of

1554    evidence (including the lobby video and internal

1555    communications) violated Plaintiffs' Fourteenth Amendment

1556    rights to due process and access to the courts; (b) enter an

1557    injunction compelling Defendants to preserve and produce all

1558    remaining evidence related to Plaintiffs' claims (including any

1559    still-existing emails, recordings, and documents) (EXHIBIT C,

1560    EXHIBIT (AR, Exhibit v), and if any such records have been

1561    destroyed, to provide a detailed, sworn accounting of what was

1562    destroyed, when, why, and on whose orders; (c) impose

1563    appropriate sanctions for spoliation of evidence, such as an

1564    adverse inference in Plaintiffs' favor or other relief the Court

1565    deems just; (d) with respect to the Michigan FOIA violations,

1566    order the City of Royal Oak to promptly provide all previously

1567    withheld records responsive to Plaintiffs' FOIA requests (with

1568    only those redactions absolutely necessary under law), and

1569    award Plaintiffs their reasonable attorney fees, costs, and

1570    disbursements under MCL 15.240(6) as the prevailing party in

1571    this FOIA dispute; (e) award punitive damages under MCL

1572    15.240(7) against the City of Royal Oak in the amount of

1573    $1,000 for each FOIA violation (or the maximum allowed by

81

1574    law) for its arbitrary and capricious denial of Plaintiffs'

1575    requests; and (f) grant such other and further relief as may be

1576    necessary to make Plaintiffs whole and to deter Defendants

1577    and others from similar misconduct in the future.


1578    203)    COUNT X – Facial Constitutional Challenge to

1579    Michigan Red Flag Law and 18 U.S.C. § 922(g)(4)

1580    204)    (Violation of Second and Fourteenth Amendments – Facial Challenge – 42
1581    U.S.C. § 1983 – Against State and Federal Defendants in Their Official
1582    Capacities)

1583    205)    Plaintiffs incorporate all preceding

1584    paragraphs as if fully set forth herein.

1585    206)    Plaintiffs bring a facial constitutional

1586    challenge to the following laws:

1587    a. The Michigan Extreme Risk Protection Order Act ("ERPO

1588    Act" or "Red Flag Law"), codified at MCL 691.1801 et seq.,

1589    and

1590    b. The federal statute 18 U.S.C. § 922(g)(4), which prohibits

1591    firearm possession by any person "who has been adjudicated

1592    as a mental defective or who has been committed to a mental

1593    institution."

82

1594      207) These statutes are facially unconstitutional

1595 because they violate both the Second Amendment's right to

1596 keep and bear arms and the Fourteenth Amendment's

1597 guarantees of due process and equal protection. They are

1598 overbroad, lack historical grounding, and enable arbitrary

1599 deprivation of fundamental rights without meaningful

1600 procedural safeguards or individualized findings of current

1601 dangerousness.

1602      208) Michigan's ERPO Act allows disarmament

1603 based on vague, speculative predictions that a person *might*

1604 pose a "substantial risk" of future harm. Orders may be

1605 granted ex parte, without notice or opportunity to be heard, and

1606 rely heavily on hearsay, conjecture, or political animus. The

1607 statute does not require a criminal charge, conviction, or even

1608 a finding of mental illness.

1609      209) This process creates a presumption of

1610 dangerousness and authorizes gun confiscation without clear

1611 and convincing evidence or adversarial due process. The law

1612 entrusts expansive discretion to law enforcement and courts

1613 without requiring actual evidence of unlawful behavior, and

1614　　　　provides no meaningful recourse once rights are stripped.

1615　　　　　　　　　　210)　Likewise, 18 U.S.C. § 922(g)(4) imposes a

1616　　　　lifetime firearm ban on individuals with any past mental health

1617　　　　adjudication or commitment, regardless of:

1618　　　　　　　　　211)　how long ago the event occurred;

1619　　　　　　　　　212)　whether the commitment was voluntary or

1620　　　　involuntary;

1621　　　　　　　　　213)　whether the person was ever dangerous; or

1622　　　　　　　　　214)　whether they have since fully recovered or

1623　　　　received a state court restoration.

1624　　　　　　　　　　215)　The federal law contains no

1625　　　　constitutionally sufficient relief mechanism. The narrow NICS

1626　　　　Restoration process is discretionary, not guaranteed, and not

1627　　　　even available in every state. Section 922(g)(4) thus functions

1628　　　　as a permanent disarmament statute for anyone who has ever

1629　　　　sought psychiatric help and been temporarily committed—no

1630　　　　matter how unjust, obsolete, or rehabilitated their situation

1631　　　　may be.

1632　　　　　　　　　　216)　These laws chill citizens from seeking

84

1633    mental health care, deter treatment, and disproportionately

1634    punish individuals for past health conditions that have no

1635    bearing on present-day fitness. This violates core Second and

1636    Fourteenth Amendment principles and frustrates public health

1637    goals.

1638    217)   Under *New York State Rifle & Pistol*

1639    *Association v. Bruen*, 142 S. Ct. 2111 (2022), any modern

1640    firearm regulation must be "consistent with the Nation's

1641    historical tradition of firearm regulation" at the time of the

1642    Founding or Reconstruction. Neither the Michigan ERPO

1643    statute nor § 922(g)(4) has any historical analogue. There were

1644    no Founding-era disarmament laws that broadly targeted

1645    individuals based on mental illness, predictions of future harm,

1646    or hospitalization.

1647    218)   In fact, during the Founding and

1648    Reconstruction eras, the right to keep and bear arms was

1649    considered inherent and universal—not subject to revocation

1650    based on state-sponsored labels or psychiatric judgments.

1651    Disarmament was historically limited to persons convicted of

1652    serious crimes or actively engaged in rebellion, not people

1653 stigmatized for seeking help or having an emotional crisis.

1654         219)    Plaintiffs remain deprived of their Second

1655 Amendment rights and have been repeatedly denied firearm

1656 access by state and federal actors under the authority of these

1657 unconstitutional laws. This denial occurred despite judicial

1658 findings and evidence of rehabilitation, and without any

1659 current finding of risk or incompetence.

1660         220)    These laws further violate the Fourteenth

1661 Amendment's Equal Protection Clause by singling out

1662 individuals with past psychiatric treatment for uniquely harsh

1663 treatment, while similarly situated individuals with other

1664 medical conditions—such as brain injuries, substance abuse

1665 recovery, or chronic illness—are not disarmed or stigmatized

1666 in the same manner.

1667         221)    The enforcement of these laws has caused

1668 and continues to cause irreparable harm to Plaintiffs, including

1669 constitutional deprivation, emotional distress, public stigma,

1670 and exacerbation of existing medical conditions. The statutes

1671 are so fundamentally flawed that they cannot be salvaged

1672 through judicial construction or case-by-case exemption—they

1673      are invalid on their face.

1674      222)   WHEREFORE (Count X): Plaintiffs

1675      respectfully request that this Court:

1676      223)   a. Declare that Michigan's Red Flag Law

1677      (MCL 691.1801 et seq.) and 18 U.S.C. § 922(g)(4) are facially

1678      unconstitutional under the Second and Fourteenth

1679      Amendments;

1680      b. Issue a permanent injunction restraining all enforcement of

1681      these laws against Plaintiffs and other similarly situated

1682      citizens;

1683      c. Declare that these laws lack any historical basis and fail the

1684      *Bruen* standard requiring a "historical tradition" of firearm

1685      regulation;

1686      d. Award attorney's fees and costs pursuant to 42 U.S.C. §

1687      1988;

1688      e. Grant any such further relief as justice requires, including

1689      declaratory and injunctive relief protecting other citizens from

1690      future enforcement.

1691        224)  COUNT  X (see exhibit v)

1692        225)   Facial and As-Applied Challenge to Denial

1693 of Firearm Rights Based on Invalid or Expired Medical

1694 Marijuana Registration

1695 *(42 U.S.C. § 1983 – Against All Defendants Who Enforced or*

1696 *Justified Disarmament on This Basis)*

1697        226)  Plaintiff Michael D. Jarrus realleges and

1698 incorporates by reference all preceding paragraphs of the

1699 original complaint.

1700        227)  Plaintiff challenges the use of any current or

1701 prior medical marijuana registration—whether valid, expired,

1702 or nonexistent—as a basis to deny Second Amendment rights,

1703 both facially and as applied.

1704        228)  In or around 2024, Plaintiff was told by

1705 Defendants, including officials at the Royal Oak Police

1706 Department, that he was being disqualified from firearm rights

1707 due to a medical marijuana card.

1708        229)  Plaintiff, confused by this justification,

1709 immediately contacted the Michigan Department of Licensing

1710     and Regulatory Affairs (LARA) to formally surrender any

1711     registration that might have existed.

1712               230)   In response, LARA issued a written

1713     confirmation that Plaintiff had no valid or current medical

1714     marijuana registration on file and that there was nothing to

1715     surrender.

1716               231)  Plaintiff provided this documentation to the

1717     Royal Oak Police Department, disproving their stated basis for

1718     denying his firearm rights.

1719               232)  Rather than acknowledge the error, ROPD

1720     shifted its justification and began reasserting a disqualification

1721     under 18 U.S.C. § 922(g)(4), despite that issue having already

1722     been resolved by a valid state court restoration order.

1723               233)   This conduct demonstrates that the original

1724     marijuana-related justification was pretextual, and that

1725     Defendants are arbitrarily shifting theories in order to deny

1726     Plaintiff's rights.

1727               234)   Under *New York State Rifle & Pistol Ass'n*

1728     *v. Bruen*, 142 S. Ct. 2111 (2022), any restriction on firearm

89

1729    rights must be rooted in the Nation's historical tradition of

1730    regulation. There is no such tradition for disarming individuals

1731    based on expired or nonexistent marijuana registrations.

1732    235)   In *United States v. Daniels*, 77 F.4th 337

1733    (5th Cir. 2023), the Fifth Circuit held that even current

1734    marijuana use does not justify categorical disarmament under

1735    the Second Amendment.

1736    236)   In *Fried v. Garland*, No. 2:22-cv-04552,

1737    2023 WL 6050724 (E.D. Pa. Sept. 15, 2023), a federal court

1738    found § 922(g)(3) unconstitutional as applied to medical

1739    marijuana users complying with state law.

1740    237)   Plaintiff was not a current cardholder and

1741    had never used that registration for unlawful conduct. Denying

1742    his firearm rights on that basis—especially after official state

1743    confirmation that no valid card existed—was unconstitutional

1744    and retaliatory.

1745    238)   Defendants' shifting explanations, reliance

1746    on expired or imaginary records, and refusal to acknowledge

1747    Plaintiff's restored status under Michigan law constitute a

1748      pattern of arbitrary and bad-faith denial in violation of the

1749      Second and Fourteenth Amendments.

1750      239) WHEREFORE (Count XI):

1751      240) Plaintiffs respectfully request that this

1752      Court:

1753      241) a. Declare that denying firearm rights based

1754      on expired, invalid, or nonexistent medical marijuana

1755      registration is unconstitutional on its face and as applied;

1756      242) b. Enjoin Defendants from asserting

1757      medical marijuana status—past or present—as a standalone

1758      basis to disarm law-abiding citizens;

1759      243) c. Award compensatory damages for the

1760      constitutional injury and retaliation;

1761      244) d. Grant any such further relief as the Court

1762      deems just and proper.

1763      245) COUNT XII – VIOLATION OF

1764      CONSTITUTIONAL STRUCTURE: ULTRA VIRES

1765 CRIMINALIZATION, PERSONAL SOVEREIGNTY,

1766 BODILY AUTONOMY, PRIVACY, AND UNLAWFUL

1767 REGISTRY REQUIREMENTS (U.S. CONST. ART. I, §§

1768 1, 8; AMENDMENTS IV, V, IX, X, AND XIV)

1769
1770      245. Plaintiffs incorporate by reference all

1771 preceding paragraphs as if fully set forth herein.

1772

1773      246. The Constitution of the United States

1774 establishes a federal government of limited, enumerated

1775 powers. (U.S. Const. art. I, § 1; see also NFIB v.

1776 Sebelius, 567 U.S. 519, 533–34 (2012)).

1777

1778      247. Nowhere within Article I, § 8, or

1779 elsewhere in the Constitution, is Congress granted

1780 authority to criminalize, regulate, monitor, or track the

1781 personal consumption of naturally occurring substances,

1782 including marijuana, that are cultivated, possessed, or

1783 ingested for personal, medical, or private use.

1784

1785       248. The criminalization, regulation, and

1786   registry systems surrounding marijuana — both through

1787   federal statutes such as the Controlled Substances Act

1788   (21 U.S.C. § 801 et seq.) and state-level medical

1789   marijuana registry schemes — exceed the lawful powers

1790   delegated to Congress and the States.

1791

1792       249. As the Supreme Court recognized in

1793   Bond v. United States, 572 U.S. 844, 857 (2014),

1794   "Federalism secures the freedom of the individual." The

1795   division of authority between federal and state

1796   governments exists to prevent overreach into areas of

1797   personal sovereignty never delegated to government

1798   authority.

1799

1800       250. The private act of consuming marijuana

1801   —particularly for personal or medical reasons—falls

1802   outside of any legitimate Commerce Clause authority,

1803   particularly when no interstate commerce is involved.

1804   Although Gonzales v. Raich, 545 U.S. 1 (2005), upheld

93

1805       federal marijuana regulation, that decision conflicts with

1806       original constitutional structure, is increasingly

1807       undermined by subsequent precedent, and should not

1808       foreclose renewed constitutional analysis.

1809

1810       251. As recognized in New York v. United

1811       States, 505 U.S. 144, 155 (1992), Congress may not

1812       "commandeer the states" or intrude into personal

1813       autonomy that lies beyond any delegated federal power.

1814

1815       252. The 10th Amendment reinforces these

1816       boundaries: "The powers not delegated to the United

1817       States by the Constitution, nor prohibited by it to the

1818       States, are reserved to the States respectively, or to the

1819       people."

1820

1821       253. While some states have adopted

1822       medical marijuana registries, such registry systems

1823       improperly compel citizens to disclose private medical

1824       information as a condition of exercising personal bodily

1825　　　　autonomy, violating well-established privacy rights

1826　　　　protected by the Fourth, Fifth, Ninth, and Fourteenth

1827　　　　Amendments as well as federal medical privacy statutes,

1828　　　　including HIPAA (42 U.S.C. § 1320d et seq.).

1829

1830　　　　　　　254. These forced disclosures constitute

1831　　　　unlawful state surveillance and violate the traditional

1832　　　　doctor-patient confidentiality relationship.

1833

1834　　　　　　　255. Furthermore, as recognized in

1835　　　　Washington v. Glucksberg, 521 U.S. 702, 720 (1997),

1836　　　　and Cruzan v. Director, Missouri Dept. of Health, 497

1837　　　　U.S. 261, 278 (1990), bodily autonomy and personal

1838　　　　medical decisions fall within the core of substantive due

1839　　　　process protections.

1840

1841　　　　　　　256. The government may not, consistent

1842　　　　with these principles, force citizens to register or

1843　　　　surrender private medical data in order to obtain

1844   permission to use a natural plant for personal medical

1845   benefit.

1846

1847          257. Even in jurisdictions such as Michigan

1848   where recreational marijuana use has been legalized,

1849   state-mandated surveillance mechanisms continue to

1850   operate through government-mandated ID scanning,

1851   tracking of purchase amounts, recording of personal

1852   identifying information, and surveillance of private

1853   consumption patterns, thereby creating de facto

1854   registries.

1855

1856          258. These systems allow the state to

1857   maintain detailed records on the lawful consumption

1858   behavior of its citizens, violating privacy interests that

1859   should be fully protected under the Constitution's

1860   structural limitations on government authority.

1861

1862          259. No constitutional provision authorizes

1863   any level of government to build databases of lawful

1864 private activity, nor to monitor natural personal

1865 consumption that takes place between an individual and

1866 their own body.

1867

1868 260. Furthermore, this surveillance

1869 architecture has been used to impose secondary

1870 penalties, such as the denial of firearm rights, based on

1871 participation in either formal or informal registry systems,

1872 despite no evidence that Plaintiffs or similarly situated

1873 individuals pose any danger to public safety.

1874

1875 261. As New York State Rifle & Pistol

1876 Association v. Bruen, 142 S. Ct. 2111 (2022), confirmed,

1877 firearm rights may not be denied based on modern

1878 regulatory schemes unless supported by a historical

1879 tradition of comparable regulation at the time of the

1880 Founding — which no such tradition exists concerning

1881 personal marijuana use or registry-based restrictions.

1882

97

262. Additionally, as recognized in Printz v. United States, 521 U.S. 898, 935 (1997), "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers…to administer or enforce a federal regulatory program," reinforcing that both federal and state actors have overstepped their lawful constitutional boundaries.

263. The registry and surveillance system challenged herein constitutes not only an ultra vires act of federal and state power but also an ongoing constitutional injury to Plaintiffs' privacy, autonomy, liberty, and Second Amendment rights.

264. Accordingly, Plaintiffs respectfully seek declaratory and injunctive relief finding that any governmental registry, monitoring, or surveillance scheme tied to lawful personal consumption of marijuana violates the Constitution.